IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| WILLIAM K. HOLMES and AIRTREK, LLC, | : : : | |
| Appellants/Cross Appellees, | : : | |
| v. | : : | Case No.: 5:07-cv-284 (CAR) |
| GENERAL ELECTRIC CAPITAL CORPORATION, | : : : : : | |
| Appellee. | : | |

## *ORDER ON APPEAL*

Before the Court is an appeal from the decision of the United States Bankruptcy Court for the Middle District of Georgia, Macon Division (Doc.1) in this case. Appellant William K. Holmes ("Holmes") determined that he needed a private aircraft to accommodate his business travel. As his aircraft holdings grew, Holmes formed a business entity, Appellant Airtrek, LLC, to purchase, own, and manage his aircraft.[1] Appellee General Electric Capital Corporation ("GECC") is in the business of leasing and financing the purchase of corporate aircraft, and financed several aircraft for Holmes.

On July 2, 2002, Holmes filed for bankruptcy and later filed a claim against GECC asserting he was entitled to $2,700,000.00 in security deposits, which GECC had improperly retained. GECC asserted it was entitled to the security deposits and filed a counterclaim for

---

[1] For the purpose of this Order, Appellant William K. Holmes and Appellant Airtrek, LLC, will be collectively refereed to as "Holmes."

1

approximately $2,500,000.00 in additional damages. After a four and a half day trial and numerous post-trial briefs, the Bankruptcy Court concluded that GECC properly retained Holmes' security deposits and was also entitled to the additional damages it claimed.

Both Holmes and GECC now appeal the Bankruptcy Court's decision asserting various issues. Having considered the record, the briefs filed by both parties, and the relevant case law, the Court agrees with the Bankruptcy Court's decision. Therefore, for the reasons explained herein, the decision of the Bankruptcy Court is **HEREBY AFFIRMED**.

## *BACKGROUND*

The entire factual basis of this action is set forth in great detail by the Bankruptcy Court in its Memorandum Opinion dated June 8, 2007. The following is a brief recitation of the relevant facts as found by the Bankruptcy Court.

GECC facilitates the purchase of private aircraft in several ways. The majority of the time GECC loans money to customers to enable the customer to purchase an aircraft from a third party. Sometimes GECC is approached by a customer who has found an aircraft that it wants to use. GECC then agrees to purchase the aircraft from a third party and lease the aircraft back to its customer. On rare occasions, GECC purchases an aircraft to hold in its portfolio of leased aircraft.

GECC's standard lease form, which was used in this case, sets forth the standard rights and obligations of the lessor and lessee. The specific terms of each lease are set forth in an annex to the lease, which includes a description of the aircraft to be leased, the "capitalized lessor's cost" of the aircraft, monthly rent payments, and other specific the term of the lease.

Monthly rent is based on the capitalized lessor's cost, which is the agreed upon price that GECC charges the customer to lease the aircraft, and the length of the lease term.

The lease provides that the lessee's failure to pay rent when due and the failure to cure the breach within ten days constitutes default. It also provides that upon default, GECC may demand that the lessee immediately pay as liquidated damages, for loss of the bargain and not as a penalty, an amount equal to the "stipulated loss value" of the aircraft plus all rent and other amounts due. The stipulated loss value of the aircraft for each month of the lease term is listed in the annex to the lease and generally decreases each month as rent is paid.

The lease also provides:

> Any Rent or other amount not paid to Lessor when due shall bear interest from the due date until paid, at the lesser of 18 percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Lease which are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform hereto.

In addition, the lease states that the transaction is governed by and construed in accordance with the laws of the State of Connecticut.

In May of 1997, Holmes decided to purchased a King Air 350 Beech aircraft to accommodate his business travel. Holmes financed the purchase through GECC and signed a promissory note for $2,375,000 and an Aircraft Security Agreement in favor of Defendant. Holmes was to repay the obligation by making monthly payments over a period of ten years.

In late 1998, Holmes decided to upgrade to an aircraft designed for international business travel. On December 30, 1998, Holmes signed a Purchase Agreement to purchase a Galaxy 1126 S/N 016 aircraft from the Galaxy Aerospace Company for $17,000,000. The Galaxy was to be delivered to Holmes on June 30, 2000.

3

While awaiting delivery of the Galaxy, Holmes decided to acquire another aircraft. On March 6, 1999, Holmes signed a Purchase Agreement to purchase an Astra SPX 1125 S/N 101 aircraft also from Galaxy Aerospace Company for $11,200,000. Holmes paid $500,000 to Galaxy Aerospace Company as an initial payment at signing and entered into a Trade-In Agreement that allowed Holmes to trade in the Astra for $10,750,000 when the Galaxy was delivered. GECC agreed to assume Holmes' obligations by purchasing both aircrafts and then leasing the aircrafts back to Holmes.

On July 27, 1999, GECC purchased the Astra from Galaxy Aerospace Company for $10,700,000. GECC then leased the Astra to Holmes. The lease is on Defendant's standard lease form and was to expire on August 1, 2000. The monthly rent payments were approximately $65,000 each month and were due on the first day of each month with a ten-day grace period. The lease listed the capitalized lessor's cost of the Astra as $11,200,000. GECC also retained the right to take advantage of the Trade-In Agreement negotiated by Holmes.

In early 2000, Holmes became concerned about reports he had received concerning performance problems with the Galaxy, so Holmes decided to sell his position in the Galaxy and lease a Falcon 900 instead. On June 30, 2000, Holmes agreed to lease a Falcon that was at the time already owned by GECC. The lease was for 144 months, and monthly rent payments of $166,000 were due on the first day of each month with a ten-day grace period. Although the Falcon was offered for a base price of $21,500,000, Holmes requested $989,939 in upgrades. Thus, the Falcon lease lists the capitalized lessor's cost as $22,489,939.

In conjunction with the lease, Holmes signed a Security Deposit Pledge Agreement dated June 30, 2000, that gave GECC a security deposit of $2,200,000 in consideration of GECC's

4

agreement to lease the Falcon to Holmes and to secure Holmes' performance of his obligations under the lease. Holmes also signed a Cross-Collateral / Cross-Default Agreement at the same time that provided that all presently-existing and after-acquired collateral shall secure Holmes' performance on all obligations to GECC. The agreement also provides that a default by Holmes under any account or agreement shall be deemed to be a default under all other accounts or agreements.

In August of 2000, when the Astra lease was to expire, GECC agreed to extend the terms of the Astra lease until December 31, 2000, as the refurbishment of the Falcon was taking longer than expected. The amendment also required Holmes to pay a re-marketing fee of $1,000,000 on or prior to the expiration date of the Astra lease to mitigate GECC's risk of selling the Astra since Holmes lost the guaranteed trade-in credit of of $10,750,000 when Holmes decided to sell his position in the Galaxy. At the same time, Holmes signed an additional Security Deposit Pledge Agreement for the Astra. Holmes gave GECC a security deposit of $500,000 to secure Holmes' obligations under the lease.

Shortly after signing the Astra amendment, Holmes called Peter Vasconcelos, an employee of GECC, and asked him to explain the re-marketing fee portion of the amendment. In response to the request, Vasconcelos sent Holmes a letter dated July 3, 2000, which states:

> Dear Bill,
> Given your decision to cancel your contract with Galaxy Aerospace on the delivery of a new Galaxy aircraft I wanted to clarify your obligations regarding the Astra SPX.
> As discussed when you cancelled the Galaxy purchase contract the buyback from Galaxy Aerospace for the Astra SPX in the amount of $10,750,000 is cancelled. You are obligated to GECC Capital to honor that buyback of $10,750,000 cancelled by Galaxy. GECC Capital will receive from you a security deposit in the amount of $500,000 on the Astra SPX. In the event that the proceeds from the sale are less than $10,250,000 you are obligated to pay GECC Capital any

5

> deficiency up to an additional $500,000 for a maximum total exposure of $1,000,000. Any deficiency greater than the $1,000,000 will be the responsibility of GECC Capital. In the event that the Astra SPX is sold for any amount over $10,750,000 you [sic] security deposit for $500,000 will be returned to you in its entirety.

Although Holmes' monthly payments on the Falcon, the Astra, and the King Air were due on October 1, 2000, Holmes failed to make his lease and loan payments on October 1, 2000, and did not make the payments within the ten-day grace period.

In an effort to resolve the matter Holmes began looking for interested parties to assume his obligations. In October of 2000, Lucent Technologies, Inc. expressed an interest in subleasing the Falcon for a term of two years for about $230,000 per month. GECC determined that the proposed sublease was not in its best interest and did not approve the sublease.

In November of 2000, GECC decided to sell the Falcon to Bechtel Corporation for $23,000,000. After learning of the proposed sale, Holmes contacted GECC to attempt to resolve the situation. After lengthy negotiations, Holmes and GECC came to an agreement on November 30, 2000.

The Agreement states that Holmes desires to terminate the Astra lease and the Falcon lease, and that Holmes desires to pay off the King Air loan. The Agreement states that Defendant is willing to terminate the Falcon lease for a total of $23,335,522.00 apportioned as follows: GECC's Investment in the Falcon of $22,489,939.00; Carrying Costs of $200,000.00; Breakage Costs of $500,000.00; and Interior Refurbishment Costs of $145,583.00. The Agreement also provides that Defendant is entitled to per diem interest of $4,301.36 from December 15, 2000, until the date the Falcon is sold. The Agreement further states that GECC has accepted a cash offer of $23,000,000 for the sale of the Falcon, which will be applied to the

6

amount owed on the Falcon lease. Any deficiency would then be applied against the Falcon security deposit of $2,200,000. The Agreement provides that the remainder of the Falcon security deposit ($2,2000,000) and the Astra security deposit ($500,000) would be held as security for Holmes' continuing obligations under the terms of the Astra Lease and the King Air loan.

The Falcon was sold for a total of $23,000,000.00 on February 21, 2001. GECC applied the proceeds of the sale to Holmes' obligations under the lease, which left a deficiency of $335,522.00. In addition, Holmes' owned an additional $292,492.48 in interest. Thus, a total of $628,014,48 of the security deposit was applied. This left Holmes with $1,571,985.52 remaining on the Falcon security deposit.

Holmes sold the King Air aircraft in early 2001 for approximately $500,000 more than his obligation on the King Air loan. Although GECC was arguably entitled to the excess, Holmes was allowed to retain it.

The Astra was more difficult to sell than the Falcon. Under the Astra lease Holmes owed the following: Stipulated Loss Value as of the date of default in the amount of $11,290,384.00; October Rent Payment in the amount of $66,851.97; and Default Interest in the amount of $2,234,730.65. GECC finally sold the Astra on November 16, 2001, for $9,000,000. After applying the proceeds from the sale and the $500,000 Astra security deposit to Holmes' obligations under the lease, there was a deficiency of $4,091,966.62. GECC then applied the remainder of the Falcon security deposit against the deficiency on the Astra. This left a final deficiency of $2,519,981.10.

## DISCUSSION

Holmes asserts the Bankruptcy Court erred on several separate issues. As the issues enumerated by Holmes have varying standards of review, the Court will address each in turn.

**A. Claimed Losses Operate as a Penalty**

Holmes contends that because GECC suffered no losses, that the amount claimed by GECC constitutes a penalty. Whether a contract provision constitutes an unenforceable penalty provision is reviewed under the clearly erroneous standard of review. See Simmons v. Conger, 86 F.3d 1080, 1085 (11th Cir. 1996).

"In deciding whether a contract provision is enforceable as liquidated damages, three factors must exist." AFLAC, Inc. v. Williams, 444 S.E.2d 314, 317 (Ga. 1994). "The injury must be difficult to estimate accurately; the parties must intend to provide damages instead of a penalty; and the sum must be a reasonable estimate of the probable loss." Id. (citation omitted). As to the first element, the Bankruptcy Court determined that the injury sustained in a default scenario was difficult to accurately estimate due to the uncertainty of the aircraft market at any given time and would vary depending on the timing and circumstances of the default. As to the second element, the Bankruptcy Court found the provision was intended to provide for damages rather than a penalty because the provision allowed GECC to receive the benefit of the bargain and account for the time, effort, and management attention that would be needed while at the same time allowing the defaulting party to have a positive outcome in a favorable aircraft market. Finally, because the stipulated loss value provision accounts for the time and effort dealing with a default and then gives the defaulting lessee credit for the sale price of the aircraft, the figure is a reasonable estimate of the probable loss. Considering the evidence presented, the Court cannot conclude the Bankruptcy Court's conclusion is clearly erroneous.

**B. Damages**

Holmes further argues that there is no evidence to support the figures agreed to in the November 30, 2000 Agreement. An award of damages is reviewed under the clearly erroneous standard of review. See In re Alchar Hardware Co., 764 F.2d 1530, 1534 (11th Cir. 1985).

Concerning the figures listed in the November 30, 2000 Agreement, the Bankruptcy Court acknowledged that GECC's representatives were often unable to reproduce calculations to support the figures the parties chose to include in the Agreement. Nevertheless, as the Bankruptcy Court explained, GECC agreed to accept less than they thought they were entitled to, and Holmes agreed to pay more than he believed he should pay in order to resolve the situation. Further, Holmes was represented by counsel when he signed the agreement. Based on the evidence before the Bankruptcy Court, this Court cannot conclude that the Bankruptcy Court's award of damages to GECC is clearly erroneous.

**C. Demand**

Holmes contends that GECC failed to make a demand for the stipulated loss value under the Astra lease. The lease provides that upon default, GECC may at any time demand that Holmes immediately pay the stipulated loss value of the Astra as liquidated damages. The Bankruptcy Court found that a letter dated April 25, 2001, was a demand for Holmes to pay the stipulated loss value. As explained by the Bankruptcy Court, the letter uses the term "stipulated loss value" and lists the amounts that GECC seeks to recover. Because whether GECC made a demand for damages is a question of fact, the Court is unable to overturn the Bankruptcy Court

unless its finding is clearly erroneous. That is not the case here.

**D. Waiver**

Holmes contends that a letter dated July 3, 2000, operated as a waiver of any right GECC may have had to collect any more than 1,000,000.00 in the sale of the Astra aircraft. As the issue of waiver is a question of fact, the clearly erroneous standard applies.

On June 30, 2000, an amendment to the Astra lease was signed because Holmes wished to sell his interest in the Galaxy Aircraft he had ordered. Because this would also mean that the Astra would not be traded for the Galaxy, the amendment included a $1,000,000 re-marketing fee to cover the cost of selling the Astra at the expiration of the lease. Shortly thereafter, Holmes requested clarification from GECC. Vasconcelos sent Homes a letter dated July 3, 2000, which stated that because the buyback option on the Astra was cancelled, Mr. Holmes would be required to cover the buyback purchase price. Vasconcelos further stated that "[i]n the event that the proceeds from the sale are less than $10,250,000 you are obligated to pay GECC Capital any deficiency up to . . . a maximum total exposure of $1,000,000." Vasconcelos testified that the letter did not apply to a default scenario.

The Bankruptcy Court determined, based on the forgoing evidence, that Vasconcelos' letter merely addressed Holmes' obligations as a result of his decision to cancel his position in the Galaxy and the resulting loss of the trade-in credit on the Astra, rather than Holmes' obligations in a default scenario. Thus, the Bankruptcy Court found that the letter did not waive GECC's right to recover more than $1,000,000 in this case. After reviewing the record, the Court concludes that the Bankruptcy Court's finding concerning this issue is not clearly erroneous.

**E. Appropriate Interest Rate**

Holmes claims that the Bankruptcy Court erred as a matter of law when it applied a 18% default interest rate. Based on the United States District Court of Connecticut's opinion in <u>Bic Sport USA, Inc. v. Kerbel</u>, 995 F.Supp. 244 (1997), which he categorizes as controlling law, Holmes argues that the Astra lease is subject to a maximum 10% default interest rate. As this is an issue of law, the Court must conduct a de novo review of this issue.

In <u>Bic Sport USA</u>, the contract in the case provided that "[a]ccounts past due 30 days will be charged interest of 1.5% per month or a maximum percentage by law on the past due balance." Because Conn. Gen.Stat. § 37-3a set the statutory rate at 10%, the district court did find that an interest rate of 10% was appropriate. In this case however, the parties specifically agreed on a default interest rate of 18%. As explained in detail by the Bankruptcy Court, courts in Connecticut uniformly hold that the statutory rate does not apply to contracts in which there is an express agreement for the payment of a higher rate. See <u>Little v. United National Investors Corp</u>., 280 A.2d 890, 893 (Conn. 1971). Accordingly, the Court finds that the 18% interest rate was properly applied in this case.

**F. Fraud**

Holmes contends that GECC committed fraud by inducing them to enter into the Astra and Falcon leases without disclosing GECC's cost of acquiring the aircrafts, and the November 30, 2000 Agreement by falsely representing that they would recover their security deposits. As the "finding of fraud is a finding of fact, [the Court] will not set aside [the Bankruptcy Court's finding] on appeal unless it is clearly erroneous. <u>First Alabama Bank, N.A. v. First State Ins. Co.</u>,

11

899 F.2d 1045, 1057 (11th Cir. 1990).

As to the Astra and Falcon leases the Bankruptcy Court found, based on the uncontradicted testimony of an expert in the field that a lessee usually does not know what the lessor paid for an aircraft, and that the price paid by Holmes was a "reasonable number" and "in an acceptable price [range]." The Bankruptcy Court then found that GECC did not make a false representation or deceive Holmes. After a thorough review of the record, the Court concludes that the Bankruptcy Court's finding concerning the Astra and Falcon leases is not clearly erroneous.

As to the November 30, 2000 Agreement, the Bankruptcy Court found, based on the testimony of GECC employees, that GECC did not guarantee or assure Holmes that his security deposits would be returned. Instead, GECC simply offered Mr. Holmes an opportunity to recover a portion of the deposit, provided there was no deficiency after the aircraft at issue were sold . Based on this testimony, the Bankruptcy Court found that Holmes was not fraudulently induced into signing the November 30, 2000 Agreement. After a thorough review of the record, the Court concludes that the Bankruptcy Court's finding concerning the November 30, 2000 Agreement is not clearly erroneous.

**G. Implied Covenant of Good Faith and Fair Dealing**

Holmes also contends that GECC breached the implied covenant of good faith and fair dealing by refusing to approve the two-year sublease of the Falcon to Lucent Technologies, Inc. As the issue of whether GECC exercised good faith and fair dealing under the terms of the Falcon Lease is an issue of fact that was analyzed by the Bankruptcy Court, a clearly erroneous

standard of review applies to the Bankruptcy Court's factual finding. See In re Chase & Sanborn Corp., 904 F.2d 588, 593 (11th Cir. 1990).

After a thorough review of the record, the Court concludes that the Bankruptcy Court's finding concerning good faith is not clearly erroneous. Lucent was only interested in subleasing the aircraft for two years of the twelve year lease. A GECC employee testified about his belief that the aircraft market was about to experience a decline in prices and expressed serious concern that Holmes would be unable to honor is financial obligations at the end of the sublease. In addition, evidence was introduced which showed the decline in prices feared by GECC actually occurred, and the aircraft decreased in value some $7,000,000 during the two year period of the proposed lease.

**H. Conversion, Turnover, and Accounting**

Holmes contends that because GECC suffered no loss on the Falcon lease and little loss on the Astra lease, that GECC was required to return a portion of his security deposit. According to Holmes, GECC's continued possession of Appellants' funds constitutes a conversion of those funds. Holmes also contends that he has a valid turnover claim and is entitled to an accounting for the same reasons. Because the Court has affirmed the Bankruptcy Court's finding that Holmes is not entitled to recover any of his security deposit, no action for conversion or turnover can succeed. In addition, as explained above, the Court also affirmed the Bankruptcy Court's finding as to damages. Thus, Holmes is not entitled to an additional accounting.

**I. GECC's Allegations of Error**

As the Court has determined that the Bankruptcy Court committed no error based on

Holmes' arguments on appeal, GECC's allegations of error are dismissed as moot.


*CONCLUSION*

For the reasons discussed above, the decision of the Bankruptcy Court is **AFFIRMED**.


**SO ORDERED**.  This 20th day of March, 2008.


                                        S/ C. Ashley Royal
                                        C. ASHLEY ROYAL
                                        UNITED STATES DISTRICT JUDGE

SCS/ssh